UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILLIAM A. SYGITOWICZ, et al., | |
| Plaintiffs, | No. C06-962Z |
| v. | ORDER |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

This matter comes before the Court on the United States' Motion for Summary Judgment, docket no. 8, Plaintiffs' Motion for Relief from a Deadline to File a Supporting Declaration in Opposition to the United States' Motion for Summary Judgment, docket no. 31, and Plaintiffs' William A. Sygitowicz, et al. Motion for Partial Summary Judgment Re: Statute of Limitations for 1993, 1994 and 1995 Taxes, docket no. 13.  Having considered the briefs and declarations in support of, and in opposition to, the motions, the Court enters the following Order.

**BACKGROUND**

**A.   Present Lawsuit**

Plaintiffs William and Louise Sygitowicz ("William and Louise") have unpaid federal income tax liabilities in the sum of $303,285.38, plus accrued but unassessed interest, penalties, and other statutory additions as provided by law, for 1993, 1994, 1995, 1997, 1998, 1999, 2000, 2001, and 2003 (the "tax years at issue").  On July 11, 2006, William and

ORDER  -1-

Louise, along with their son, Daniel Sygitowicz, and his wife, Kelly Sygitowicz ("Daniel and Kelly"), filed a complaint against the United States to quiet title to real property located at 1864 Academy Street in Bellingham, Washington, 98226 (the "Academy Street property"). Compl., Case No. 06-962Z, docket no. 1. Equitable subrogation is the only legal claim alleged in the Complaint. Id. ¶¶ 25-27. On March 5, 2007, the United States filed a complaint against William, Louise, Daniel and Kelly Sygitowicz as well as against potential creditors to reduce to judgment the federal tax assessments against William and Louise, to set aside an allegedly fraudulent conveyance of the Academy Street property from William and Louise to Daniel and Kelly, to declare Daniel and Kelly as alter egos and/or nominees of William and Louise, and to foreclose related federal tax liens securing their tax liabilities on the Academy Street property. Compl., Case No. C07-340Z, docket no. 1, ¶¶ 1, 12-41. On June 27, 2007, the Court consolidated Case No. C07-340Z with Case No. C06-962Z. Minute Order, docket no. 11.

**B.      Federal Income Taxes Owed to the United States**

On May 8, 1996, the Internal Revenue Service ("IRS") received William and Louise Sygitowicz's personal income tax returns filed on Form 1040 for tax years 1993, 1994, and 1995.[1] Johnson Decl., docket no. 14, ¶ 3, Ex. A. The United States assessed the taxes owed by William and Louise for these three years, as well as the other tax years at issue, with a total assessment of federal income tax liabilities in the sum of $303,285.38, plus accrued but unassessed interest, penalties, and other statutory additions as provided by law. Ham Decl., docket no. 9, ¶¶ 3-11, Exs. A-I (Certificates of Assessments, Payments and Other Specified Matters). The relevant tax assessment dates are June 17, 1996 for the 1993 tax year, June 24, 1996 for the 1994 tax year, and July 29, 1996 for the 1995 tax year. Id. ¶¶ 3-5, Exs. A-C.

---

[1] Tax years 1993, 1994, and 1995 are highlighted in certain respects because Plaintiffs raise a statute of limitations issue as to these years.

ORDER   -2-

William and Louise submitted an Offer in Compromise, dated November 30, 1999, on Form 656, for tax years 1992, 1993, 1994, 1995, 1996, 1997, and 1998, which the IRS accepted for processing on January 13, 2000.  Waight Decl., docket no. 21, ¶ 3, Ex. A; Johnson Decl. ¶ 5, Ex. A.  William and Louise offered to pay $15,000 to the IRS in cash within thirty days to satisfy their tax liabilities for these years.  Waight Decl. Ex. A.  The Offer in Compromise was submitted based on their alleged "insufficient assets and income to pay the full amount."  Id.  On October 5, 2000, the IRS returned the Offer in Compromise to William and Louise without rejecting (or accepting) the offer because they did not cooperate in providing bank records, checks, deposit receipts, withdrawal receipts, and other financial information required by the IRS to adequately evaluate their offer.  Id. ¶ 4, Ex. B (Letter stating "We are returning your Form 656, Offer in Compromise for the following reason(s): We requested verification of financial information you previously provided.  To date, we have not received all of the required information."); see also Sygitowicz Decl., docket no. 15, ¶ 4.

The United States recorded Notice of Federal Tax Liens ("NFTL") with the County Auditor's Office for Whatcom County, Washington (the "County Auditor") regarding William and Louise's federal income tax liabilities for the tax years at issue.  Ham Decl. ¶¶ 12-16, Exs. J-N.  The NFTLs for the tax years at issue were recorded on the following dates:

| **Tax Year:** | **Date NTFL Filed:** | **Date NTFL Refiled if Applicable:** |
| --- | --- | --- |
| 1993 | August 6, 1996 | June 9, 2006 |
| 1994 | August 6, 1996 | June 9, 2006 |
| 1995 | April 8, 1997 | June 9, 2006 |
| 1997 | January 5, 2000 | N/A |
| 1998 | January 14, 2005 | N/A |

ORDER  -3-

| Tax Year: | Date NTFL Filed: | Date NTFL Refiled if Applicable: |
|---|---|---|
| 1999 | June 10, 2005 | N/A |
| 2000 | June 10, 2005 | N/A |
| 2001 | June 10, 2005 | N/A |
| 2003 | June 10, 2005 | N/A |

Id.

**C.   The Waznys' and Nordells' Deeds of Trust**

On October 31, 2002 (after the United States' tax liens for 1993, 1994, 1995, and 1997 were recorded), two Deeds of Trust were recorded with the County Auditor, naming William and Louise as grantors and encumbering the Academy Street property. Ham Decl. ¶¶ 18-20, Exs. P-R. The beneficiaries were listed as: (1) Lawrence and/or Sarah Nordell, who loaned William and Louise $75,000 (Ex. P) and (2) Mieczyslaw and Lucy Wazny, who loaned William and Louise $110,000 (Ex. Q).[2] William and Louise used these funds exclusively to pay off a mortgage holder who was about to foreclose on the Academy Street property. Ham Decl. ¶ 24, Ex. V (William and Louise Dep.) at 36-37. However, William and/or Louise had originally represented to the Waznys and the Nordells that the money would be used to buy out a partner in a real estate partnership. Id. ¶¶ 25-26, Ex. X (S. Nordell Dep.) at 11, and Ex. Y (M. Wazny Dep.) at 10-11. William and Louise defaulted on each loan; in 2003, after bringing suit in the Superior Court of Washington, Whatcom County, the Nordells and Waznys obtained respective Judgments and Decrees of Foreclosure in their favor and against William and Louise. Id. ¶¶ 21, 23, Exs. S, U. After entry of the respective Judgments, William and Louise fully repaid all of the foregoing debts, and the

---

[2] There was a third Deed of Trust benefitting Stephen and Pamela Pederson, who loaned William and Louise $75,000 (Ex. R); however, the Pedersons' loan was paid off, and Plaintiffs are not seeking subrogation to the Pedersons' Deed of Trust. Pls.' Opp'n, docket no. 25, at 11.

ORDER   -4-

Nordells and Waznys have disclaimed any right, title, or interest in the Academy Street property.  Stipulated Disclaimers (C07-340Z), docket nos. 17 and 18.

**D.      The Julins' Deed of Trust**

On June 1, 2005 (after the United States' tax liens for 1993, 1994, 1995, 1997, and 1998 were recorded), a Deed of Trust was recorded with the County Auditor, naming William and Louise as grantors and encumbering the Academy Street property.  Ham Decl. ¶ 17, Ex. 1 attached to Ex. O.  Carolyn and Robert Julin were listed as the beneficiaries of this Deed of Trust.  Id.  They loaned William and Louise $225,000.  Id.  William and Louise originally represented to the Julins that the money would be used to buy out a partner in a real estate partnership, and the loan would be secured against a fifty percent interest in the real estate partnership.  Ham Decl. ¶¶ 17, 24, Ex. O (Julin Dep.) at 10-13, 28-29 and Ex. V (William and Louise Dep.) at 44-47.  When the negotiations with the real estate partner failed, William and Louise told the Julins that the money would "be used for the house" and they secured the loan against the Academy Street property.  Ham Decl. ¶¶ 17, 24, Ex. O (Julin Dep.) at 16-17, 29 and Ex. V (William and Louise Dep.) at 47.  The Julins agreed to William and Louise's use of the $225,000 loan to pay off "some notes on the house," which turned out to be the debts owed to the Waznys and Nordells.  Id. ¶ 17, Ex. O (Julin Dep.) at 21.  The Julins had allowed William to use the money as William saw fit, and William and Louise did not ask permission, in advance, from the Julins to use the $225,000 to pay off the Wazny and Nordell debts.  Id. ("Q: But he never asked you for permission, then, whether he could use [the money to pay off some notes on the house]?  A: No.  The money had been loaned to him.  It was his to, at that point to use as he saw fit.  I don't discuss our, what we pay off first with him, and he doesn't do it with us.").

Carolyn Julin is the sister of Louise Sygitowicz.  Id. ¶ 17, Ex. O (Julin Dep.) at 15. Prior to June 1, 2005, when the Julins' Deed of Trust was recorded, the Julins never had any interest in, or ownership of, the Academy Street property.  Id. ¶ 17, Ex. O (Julin Dep.) at 18.

The Julins did not have any legal obligation to lend William and Louise the money to pay off the debts of the Waznys and Nordells. Id. ¶¶ 17, 24, Ex. O (Julin Dep.) at 18-19, 22 and Ex. V (William and Louise Dep.) at 48-49. The Julins did not even know the Waznys or the Nordells. Id. ¶¶ 17, 24, Ex. O (Julin Dep.) at 18-19 and Ex. V (William and Louise Dep.) at 48-49. William and Louise did not mislead or deceive the Julins in connection with the $225,000 loan. Id. ¶¶ 17, 24, Ex. O (Julin Dep.) at 22-23 and Ex. V (William and Louise Dep.) at 50-51. The Julins freely and voluntarily loaned the money to William and Louise. Id. ¶¶ 17, 24, Ex. O (Julin Dep.) at 21-22 and Ex. V (William and Louise Dep.) at 48. The Julins had no expectation at the time of their loan that they would be subrogated to the positions held by the Waznys and Nordells against the Academy Street property; indeed, they had no expectations regarding their priorities. Id. ¶ 17, Ex. O (Julin Dep.) at 23-25, 27. Although the Julins were aware of the IRS's assertion that William and Louise owed the IRS money prior to the Julins' execution of a promissory note for the $225,000 loan, the Julins did not inquire whether there were any federal tax liens on the Academy Street property. Id. ¶ 17, Ex. O (Julin Dep.) at 19-21. The Julins did not know of any liens on the Academy Street property at the time they made the loan. Id. ¶ 17, Ex. O (Julin Dep.) at 23.

**E.    Present Motions**

There are two summary judgment motions before the Court, and a motion for relief from deadline. Prior to consolidation, the United States filed a motion for summary judgment in C06-962Z, challenging Plaintiffs' allegations that the Julins' Deed of Trust should be equitably subrogated to the former positions of the Waznys' and Nordells' Deeds of Trust, and that the Waznys' and Nordells' Deeds of Trust were purchase money securities. U.S. Mot., docket no. 8. The United States' motion does not seek to reduce to judgment William and Louise's unpaid federal tax liabilities or to enforce its tax liens; as a result, Plaintiffs' bona fide purchaser argument (regarding Daniel and Kelly's purchase of the Academy Street property in 2004), submitted in opposition to the United States' motion, is

irrelevant. Pls.' Opp'n at 6-7. In opposition to the United States' Motion for Summary Judgment, Plaintiffs filed a motion for relief from deadline, docket no. 31. After consolidation, Plaintiffs William and Louise Sygitowicz, and Daniel and Kelly Sygitowicz, filed a motion for partial summary judgment, asserting that the United States' claims to enforce the tax liens for tax years 1993, 1994, and 1995 through foreclosure are barred by a ten-year statute of limitations. Pls.' Mot., docket no. 13.

# DISCUSSION

## A.   Summary Judgment Standard

Summary judgment is appropriate when the movant demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## B.   United States' Motion for Summary Judgment, docket no. 8

Section 6321 of the Internal Revenue Code establishes a tax "lien in favor of the United States upon all property and rights to property, whether real or personal," belonging to any taxpayer who has not paid taxes. 26 U.S.C. ¶ 6321. The tax lien "shall arise at the time the assessment is made." 26 U.S.C. ¶ 6322. "Federal tax liens do not automatically have priority over all other liens." United States By and Through Internal Revenue Serv. v. McDermott, 507 U.S. 447, 449 (1993). "Absent provision to the contrary, priority for purposes of federal law is governed by the common-law principle that 'the first in time is the first in right.'" Id. (quoting United States v. New Britain, 347 U.S. 81, 85 (1954)). Notices of Federal Tax Liens ("NFTLs") must first be recorded under applicable state law in order for the United States to have a valid lien "as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor." 26 U.S.C. ¶ 6323(a), (f). Under Washington state law, the United States must record its NFTL against real property "in the office of the recording officer of the county where the property is situated." RCW 65.08.070.

In the present case, that office is the County Auditor's Office for Whatcom County, Washington.

The United States' Motion for Summary Judgment concerns Plaintiffs' claim that the Julins' Deed of Trust – although junior to the United States tax liens for 1993, 1994, 1995, 1997, and 1998[3] – should be deemed superior to the federal tax liens for these years. The United States' argues that in order for the Julins' Deed of Trust to be superior, the Court would have to: (1) apply the doctrine of equitable subrogation to subrogate the Julins' Deed of Trust to the Waznys' and Nordells' Deeds of Trust,[4] and (2) determine that the now fully repaid loans of the Waznys and Nordells were purchase money securities that are superior even though they were recorded after the United States' tax liens for 1993, 1994, 1995, and 1997.[5] The United States argues that equitable subrogation does not apply on the facts of this case and that the Waznys' and Nordells' Deeds of Trust were not purchase money securities.[6]

"Equitable subrogation is a state-law doctrine." Mort v. United States, 86 F.3d 890, 893 (1996). The Internal Revenue Code recognizes that certain interests may be subrogated

---

[3] The United States' tax liens for 1993, 1994, 1995, 1997, and 1998 were recorded with the County Auditor between August 6, 1996 and January 14, 2005, i.e., before the recordation on June 1, 2005 of the Julins' Deed of Trust.

[4] The United States does not move for summary judgment on the Pedersons' Deed of Trust in light of Plaintiffs' Complaint, which only seeks to have the Julins' Deed of Trust subrogated to the Waznys' and the Nordells' Deeds of Trust. U.S. Mot. at 2 n.1 (citing Compl. at 5).

[5] The United States' tax liens for 1993, 1994, 1995, and 1997 were recorded with the County Auditor between August 6, 1996, and January 5, 2000, i.e., before the recordation on October 31, 2002 of the Waznys' and Nordells' Deeds of Trust.

[6] The United States briefly argues, without any legal authority, that the Sygitowiczes lack standing to assert equitable subrogation. The United States argues that the Julins, who are not parties to this action, are the ones who may claim injury by not being equitably subrogated. U.S. Mot. at 10-11 n.7. Plaintiffs respond that Washington case law on equitable subrogation holds that "[i]t is not necessary that a subrogee be a party to the lawsuit." Pls.' Opp'n at 15 (quoting Moore v. Moore, 20 Wn. App. 909, 914 (1978). The United States abandons the standing argument in its reply, docket no. 28.

ORDER -8-

under state law "for purposes of any lien imposed by section 6321 or 6324." 26 U.S.C. § 6323(i)(2). "Equitable subrogation provides an exception to the first in time rule by permitting a person who pays off an encumbrance to assume the same lien priority position as the holder of the previous encumbrance." Bank of America, N.A. v. Wells Fargo Bank, N.A., 126 Wn. App. 710, 714 (2005), rev'd on other grounds, Bank of America, N.A. v. Prestance Corp., 160 Wn.2d 560 (2007). "As an equitable remedy, subrogation is designed to avoid one person receiving an unearned windfall, i.e., the intervening lienholder through an advancement in priority, at the expense of another, i.e., the new mortgagee who paid the prior debt." Id.

"Subrogation has at least two elements. First, the person seeking it must have answered for the debt of another, usually by paying the other's creditor. Second, the person must have acted under some duty or compulsion, legal or moral, and not as a volunteer or intermeddler." BNC Mortgage, Inc. v. Tax Pros, Inc., 111 Wn. App. 238, 253 (2002) (internal quotations and citations omitted). "A person is a volunteer if he or she acts freely and without compulsion." Id. "A person is under duty or compulsion if he or she acts to fulfill his or her own legal duty, to protect his own rights or to save his own property, or in some other way not freely and voluntarily chosen by him." Id. The United States does not provide an analysis of these two elements per se.[7] Instead, the United States frames its analysis around the "illustrations" of equitable subrogation contained in Restatement (Third) of Property: Mortgages § 7.6 (1997) ("Section 7.6").[8]

---

[7] However, the United States' analysis is the same in substance. The Washington Court of Appeals in BNC analyzed that case using the two elements approach, as well as the Restatement's four illustrations approach. BNC, 111 Wn. App. at 253-256. Here, because the United States admits that the Julins' loan was used to pay off the Waznys and the Nordells, the first element of equitable subrogation is satisfied. Because the Julins freely and voluntarily loaned the Sygitowiczes the money, without any legal or other obligation to do so, the second element of equitable subrogation is not satisfied.

[8] As noted by the Washington Court of Appeals in BNC, 111 Wn. App. at 258 n.59, the Washington Supreme Court in Kim v. Lee, 145 Wn.2d 79 (2001), has confused this area of the law by applying Section 7.3 of the Restatement rather than Section 7.6. Section 7.3 seems designed to apply when a mortgagee replaces its own previous mortgage, whereas Section 7.6

ORDER -9-

Washington courts have adopted the doctrine of equitable subrogation, as outlined in Section 7.6. See BNC, 111 Wn. App. at 255-256. Section 7.6 describes equitable subrogation as follows:

> One who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment. Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.

Restatement (Third) of Property: Mortgages § 7.6(a) (1997). Section 7.6 further provides:

> By way of illustration, subrogation is appropriate to prevent unjust enrichment if the person seeking subrogation performs the obligation:
>
> (1) in order to protect his or her interest;
>
> (2) under a legal duty to do so;
>
> (3) on account of misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition; or
>
> (4) upon a request from the obligor or the obligor's successor to do so, if the person performing was promised repayment and reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged, and if subrogation will not materially prejudice the holders of intervening interests in the real estate.

Restatement (Third) of Property: Mortgages § 7.6(b) (1997).

The United States argues that the Julins do not fit within any of the Restatement's four illustrations. First, the Julins never had any interest in the Academy Street property:

> Q: Mr. Julin, you never held any sort of interest against the Academy Road house property before this deed of trust [Deed of Trust on June 1, 2005 securing the Julins' loan to the Sygitowiczes] was recorded, did you?
>
> A: No, never.
>
> Q: You didn't own part of it?

---

seems designed to apply when a mortgagee replaces *another* mortgagee's previous mortgage. Section 7.6 applies here because the Julins' loan went to pay off the Waznys' and Nordells' loan. Plaintiffs briefly discuss Section 7.3, but then they rely on case law that in turn relies on Section 7.6. Pls.' Opp'n at 9-10 (citing Bank of America v. Prestance, 160 Wn.2d at 567 n.6).

ORDER -10-

A: No, I did not.

Ham Decl., ¶ 17, Ex. O (Julin Dep.) at 18.

Second, the Julins never had a legal duty to pay off the debts owed by the Sygitowiczes to the Waznys and the Nordells:

Q: You did this voluntarily, lend them [the Sygitowiczes] this money?

A: Yes, I did.

Q: You weren't compelled to or even have a legal duty to lend them this money? None at all?

A: No, none at all.

Id. at 22. The Julins did not even know who the Waznys and the Nordells were prior to this action:

Q: Are you familiar with the Nordells [and] the Waznys?

A: The who?

Q: The Waznys [and] Nordells?

A: No, I never heard those names until I saw a deposition I was supposed to sign from [Plaintiff's counsel] Cory Johnson, I believe it was.

Q: So, you have never spoken to them before?

A: I have never spoken to them, never seen them, never even heard the name of those people before.

Id. at 19.

Third, the Julins did not loan the Sygitowiczes money on account of misrepresentation, deceit, or other similar imposition:

Q: Now, when Bill and Louise Sygitowicz told you that they wanted to use the money to pay off these senior debts [debts held by the Waznys and Nordells], did you have a problem with that?

A: No.

Q: So, you don't believe they . . . [m]isrepresented themselves to you?

ORDER   -11-

1   A: No, I don't.

2   Q: Do you feel that they misled you?

3   A: No.

4   Q: Do you feel that they deceived you?

5   A: No.

Id. at 22-23.  Indeed, the Julins loaned the money freely and voluntarily.  Id. at 21-22.

Fourth, the Julins had no expectation that they would be subrogated to the priority of the Waznys' and Nordells' Deeds of Trust:

   Q: Mr. Julin, did you expect to have a priority that would be above liens that were already recorded against the Academy Road house?  What sort of expectations did you have as to your priority?

   A: I did not know about what, that there were these liens on the house, so I had no expectations about my priorities.

   . . .

   Q: You had no expectations as to priority, then?

   A: No.

Id. at 23-25.  Mr. Julin did not ask, and the Sygitowiczes did not tell the Julins, what the Julins' priority would be.  Id. at 24-25.  The United States concludes that none of the four "factors" for equitable subrogation apply here.

Plaintiffs argue that the United States has improperly construed the illustrations in Section 7.6(b) as the elements of equitable subrogation.  Pls.' Opp'n at 13.  Plaintiffs' approach comes from the Washington Supreme Court's recent statement: "To be eligible for equitable subrogation under the Restatement the lender must show it expected to receive a first priority and no junior lender will be materially prejudiced."  Bank of America v. Prestance, 160 Wn.2d at 567 n.6 (citing Restatement (Third) § 7.6 cmts. e, f, at 519, 522). Plaintiffs argue that there is a genuine issue of material fact as to whether the Julins expected to receive first priority.  This discussion overlaps with the fourth "illustration" in Section 7.6(b).  Plaintiffs rely on the following excerpt from the Robert Julin Deposition:

ORDER  -12-

> Q: So, you had no expectations that you would be the first deed of trust or the first lien of the property?
>
> A: I thought a deed of trust was a deed of trust. I'm not super knowledgeable on these things, and I thought that was just straight deed of trust in the property and didn't know about any other liens there.
>
> Q: Did you expect to be in the first position against the –
>
> A: I guess I assumed I was.
>
> . . .
>
> Q: So, when you got the deed of trust on the house, you were not aware of the Federal tax liens?
>
> A: No.
>
> Q: And as I think you testified, the deed of trust you thought was a deed of trust, and you assumed that it was first priority?
>
> A: Yea, I would have assumed that, but I didn't know of any reason why it wouldn't.

Ham Decl., ¶ 17, Ex. O (Julin Dep.) at 23, 28. This testimony fails to raise a genuine issue of material fact that the Julins expected to receive the priority position of the Waznys' and Nordells' Deeds of Trust. Because the Julins had no expectation of receiving first priority, the Court does not reach the issue of material prejudice.

Plaintiffs point out, correctly, that no express agreement is needed for a person to reasonably expect to receive a senior security interest. In re Farmers' & Merchants' State Bank of Nooksack, 175 Wn. 78, 87 (1933). Equitable subrogation is appropriate "[i]f it can be clearly implied from all the facts and circumstances of the particular case that it was the intention of the parties that the person making the advancement was to have security of a dignity and position equal to that which his advancement discharged." Id. All the facts and circumstances of this case show that the Julins' had no intention or expectation that they were to have a security interest equal to that of the Waznys and Nordells. It is undisputed that the Julins did not even know who the Waznys and the Nordells were at the time of their loan, and that the Julins had no knowledge of any encumbrances on the Academy Street

ORDER  -13-

property at the time of their loan. It is also undisputed that the Julins loaned the Sygitowiczes money to buy out a partner in a real estate partnership, and only when those negotiations failed did the Sygitowiczes use the money to pay off the Waznys and Nordells; the Sygitowiczes paid the Waznys and Nordells off without any advanced permission from the Julins. In contrast, in Mort, where the Ninth Circuit applied the doctrine of equitable subrogation, the subsequent mortgagors (i.e., the Belmonts) loaned the money to the trust to pay off the original mortgagors (i.e., the Kerns) (and the Belmonts, in turn, assigned their interest to the Morts). Mort, 86 F.3d at 892, 894. The Court concludes that the doctrine of equitable subrogation does not apply because the Julins loaned the Sygitowiczes the $225,000 without any expectation of taking the priority position of the Waznys and the Nordells. Accordingly, the Court GRANTS the United States' Motion for Summary Judgment, docket no. 8, and DISMISSES with prejudice Plaintiffs' Complaint to Quiet Title to Real Property based on equitable subrogation, docket no. 1 (in Case No. C06-962Z).[9]

**C.  Plaintiffs' William A. Sygitowicz, et al. Motion for Partial Summary Judgment Re: Statute of Limitations for 1993, 1994 and 1995 Taxes, docket no. 13**

Plaintiffs argue that the United States' claims to enforce the tax liens for tax years 1993, 1994, and 1995 through foreclosure, see Compl. in C07-340Z, docket no. 1, ¶¶ 14-16, 23-28, are barred by a ten-year statute of limitations. The United States filed its complaint on March 5, 2007. The applicable statute of limitations provides, in pertinent part:

> Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected . . . by a proceeding in court, but only if . . . the proceeding begun – (1) within 10 years after the assessment of the tax. . . .

26 U.S.C. § 6502(a)(1) ("Section 6502"). "[T]he amount of any tax imposed by this title

---

[9] The purchase money mortgage issue is moot in light of the Court's holding that the doctrine of equitable subrogation does not apply. Accordingly, the Court DENIES as moot Plaintiffs' Motion for Relief from a Deadline to File a Supporting Declaration in Opposition to the United States' Motion for Summary Judgment, docket no. 31. The Court notes for the record that if it were to have reached the purchase money mortgage issue, the Court would have held that Plaintiffs have raised a genuine issue of material fact based upon the Declaration of William Sygitowicz, docket no. 27, ¶¶ 2-8.

ORDER  -14-

shall be assessed within 3 years after the return[10] was filed (whether or not such return was filed on or after the date prescribed))." 26 U.S.C. § 6501(a) ("Section 6501"). "The assessment shall be made by recording the liability of the taxpayer in the office of the Secretary [of the Treasury] in accordance with rules or regulations prescribed by the Secretary." United States v. Galletti, 541 U.S. 114, 119 (2004) (citing 26 U.S.C. § 6203). "Within 60 days of the assessment, the Secretary is required to 'give notice to each person liable for the unpaid tax, stating the amount and demanding payment thereof.'" Id. (citing 26 U.S.C. § 6303(a)). "If the tax is properly assessed within 3 years, the limitations period for collection of the tax is extended by 10 years from the date of the assessment." Id. (citing Section 6502). "The assessment of a tax liability . . . extends the period during which the Government can collect the tax." Id. at 123.

Plaintiffs argue that the statute of limitations began to run on May 8, 1996, which is the date Plaintiffs filed their tax returns for the years 1993, 1994, and 1995. They assert that the date of the "assessment" referred to in Section 6502 is the date the return is filed, i.e., the self-assessment date, if there is no subsequent deficiency assessment by the IRS.[11] Plaintiffs rely on United States v. Amori, 136 F. Supp. 601 (N.D. Cal. 1955), which actually undermines Plaintiffs' argument. In Amori, the Court rejected Defendants' contention that the "assessment" mentioned in Section 276 [predecessor to Section 6502] refers to the self-assessment which takes place when a taxpayer files his return. Amori, 136 F.Supp. at 601-

---

[10] "The term 'return' means the return required to be filed by the taxpayer." 26 U.S.C. § 6501(a).

[11] In their reply, Plaintiffs argue that there is no justification for giving the United States more than ten years to collect the tax when the United States agrees with the amount of taxes owed in the tax return. Pls.' Reply, docket no. 30, at 4. The Court does not have the tax returns for 1993, 1994, and 1995 to determine whether the IRS was rejecting the Sygitowiczes' self-assessment when the IRS assessed the taxes. See United States v. Galletti, 541 U.S. at 122 ("[W]here the Secretary rejects the self-assessment of the taxpayer or discovers that the taxpayer has failed to file a return, the Secretary calculates the proper amount of liability and records it in the Government's books."). The reasons why the United States assessed the Sygitowiczes' taxes are irrelevant to the issues before the Court because Galletti is clear that once an assessment is conducted (which Plaintiffs do not dispute occurred), the statute of limitations begins to run from the date of the United States' assessment.

ORDER -15-

602 (stating that "[i]t would not be reasonable for this Court to assume that Congress meant the word 'assessment' to refer to the filing of the return in Section 276 [predecessor to Section 6502], in view of the language used in Section 275 [predecessor to Section 6501]"). Plaintiffs also rely on <u>Monaghan v. Comm'r of Internal Revenue</u>, 16 T.C.M. (CCH) 159 (1957), but <u>Monaghan</u> does not address the Section 6502 assessment/statute of limitations issue; the issue in <u>Monaghan</u> is whether a notice of deficiency was mailed within the three-year period prescribed by Section 275 [predecessor to Section 6501]. The Court rejects Plaintiffs' argument that the ten-year statute of limitations began to run on May 8, 1996, when they filed their tax returns for the years 1993, 1994, and 1995, and accepts the United States' position that the statue of limitations began to run from the date of the United States' assessment.

The United States assessed the taxes for the 1993, 1994, and 1995 tax years on the following dates:

| **Year** | **Assessment Date** |
|---|---|
| 1993 | June 17, 1996 |
| 1994 | June 24, 1996 |
| 1995 | July 29, 1996 |

Ham Decl. ¶¶ 3-5, Exs. A-C. Accordingly, the expiration of the statute of limitations would have occurred in the June/July 2006 time frame for the 1993, 1994, and 1995 tax years, *but for* the rules that suspend the statute of limitations under certain circumstances.

William and Louise's Offer of Compromise suspended the period of limitations.[12] "The running of the period of limitations provided in section 6501 or 6502 . . . shall . . . be suspended for the period during which the Secretary is prohibited from making the assessment or from collecting by levy or a proceeding in court, and for 60 days thereafter."

---

[12] The filing of a bankruptcy petition would also suspend the statute of limitations, but William and Louise have not filed for bankruptcy in the relevant time period (since at least 1990 through the present). Sygitowicz Decl., docket no. 15, ¶ 3.

ORDER   -16-

26 U.S.C. § 6503(a)(1). At the time of the Offer in Compromise, temporary Treasury Regulations issued pursuant to 26 U.S.C. § 7122 governed the acceptance of offers-in-compromise.[13] Temporary Treasury Regulation 301.7122-1T provided, in pertinent part:

> (c)(2) An offer to compromise becomes pending when it is accepted for processing. If an offer accepted for processing does not contain sufficient information to permit the IRS to evaluate whether the offer should be accepted, the IRS will request the taxpayer to provide the needed additional information. If the taxpayer does not submit the additional information that the IRS has requested within a reasonable time period after such a request, the IRS may return the offer to the taxpayer. . . . An offer returned following acceptance for processing is deemed pending only for the period between the date the offer is accepted for processing and the date the IRS returns the offer to the taxpayer.
>
> (e)(5)(ii) Where a determination is made to return offer documents . . . because the taxpayer failed to provide requested information . . . under paragraph (c)(2) of this section, the return of the offer does not constitute a rejection of the offer for purposes of this provision and does not entitle the taxpayer to appeal the matter. . .
>
> (f)(2)(i) For offers pending on or made on or after December 31, 1999, the IRS will not make any levies to collect the liability that is the subject of the compromise during the period the IRS is evaluating whether such offer will be accepted or rejected, for 30 days immediately following the rejection of the offer, and for any period when a timely filed appeal from the rejection is being considered by Appeals.
>
> (f)(2)(iv) The IRS may levy to collect the liability that is the subject of an offer to compromise at any time after it determines, under paragraph (c)(2) of this section, that a pending offer did not contain sufficient information to permit evaluation of whether the offer should be accepted. . . .

26 C.F.R. § 301.7122-1T(c), (e)-(f).

Applying these regulations, William and Louise's Offer in Compromise became pending when it was accepted for processing, on January 13, 2000, 26 C.F.R. § 301.7122-1T(c)(2); the period in which the Offer in Compromise was pending ended when the IRS

---

[13] The applicable temporary regulation, § 301.7122-1T, can be found at 64 Fed.Reg. 39,020 (July 21, 1999). The final regulation, codified at 26 C.F.R. § 301.7122-1, is substantially identical, but does not apply here. See Fargo v. Comm'r Internal Revenue, 87 T.C.M. 815 at n.2 (2004) ("As petitioners submitted their offer in compromise after July 21, 1999, and before July 18, 2002, it is governed by the temporary regulations that were then in force.").

ORDER -17-

returned the Offer in Compromise on October 5, 2000, id.;[14] the return of the Offer in Compromise did not constitute a rejection of the offer, 26 C.F.R. § 301.7122-1T(e)(5)(ii); the IRS was prohibited from taking action to collect the tax liabilities at issue in the Offer in Compromise, including those for the tax years 1993, 1994, and 1995, during the January 13, 2000 to October 5, 2000 period, totaling 266 days,[15] in which the IRS was evaluating whether the Offer in Compromise would be accepted or rejected, 26 C.F.R. § 301.7122-1T(f)(2) and Waight Decl. ¶ 5; the IRS was allowed to take action to collect the tax liabilities after the October 5, 2000 return date, 26 C.F.R. § 301.7122-1T(f)(2)(iv).  Accordingly, the ten-year statute of limitations is tolled for 266 days, as follows:

| **Year** | **Assessment Date** | **Date After 10-Year Statute of Limitations** | **Period Tolled** | **SOL Date** |
|---|---|---|---|---|
| 1993 | June 17, 1996 | June 17, 2006 | 266 days | Mar. 10, 2007 |
| 1994 | June 24, 1996 | June 24, 2006 | 266 days | Mar. 17, 2007 |
| 1995 | July 29, 1996 | July 29, 2006 | 266 days | Apr. 21, 2007 |

---

[14] Notwithstanding Plaintiffs' position in their opening motion that the statute of limitations was suspended between January 13, 2000 and October 5, 2000, Plaintiffs' reply brief argues that the Offer in Compromise did not suspend the statute of limitations.  Pls.' Reply at 2-3.  Plaintiffs' first argument that the Offer was not "pending" fails in light of 26 C.F.R. § 301.7122-1T(c)(2), which clearly spells out the start and stop pending dates for an Offer that was accepted for processing and later returned to the taxpayer.  Plaintiffs' second argument that the United States provided no evidence that the IRS was prohibited from taking collection action is undermined foremost by Plaintiffs' admission in its opening brief that the treasury regulations in effect at the time of the Offer in Compromise prohibited the IRS from taking collection action, Pls.' Mot., docket no. 13, at 4-5, and by paragraph (f)(2) of the Treasury Regulations that prohibit collection action while the IRS is evaluating an Offer in Compromise.  Specifically, Plaintiffs argue that the United States failed to provide evidence of a "Code 71" entry into the IRS system that shows that no collection enforcement can occur, relying on In re Nader, 1999 WL 627394 (Bankr. Ct. E.D. Pa. Aug. 16, 1999).  Even if the Court were to consider this case, which was raised for the first time in a reply brief, Plaintiffs have failed to show that there is a statutory or regulatory requirement for such a code to be entered; the code appears to be an administrative undertaking "designed to prevent notices or unnecessary action from being taken against the taxpayer."  Nader, 1999 WL 627394 at *5.

[15] Plaintiffs' opening motion calculated the tolling period as 297 days.  The United States contends that Plaintiffs erroneously included January 13, 2000 and erroneously added 30 extra days pursuant to 26 C.F.R. § 301.7122-1T(f)(2)(i), which does not apply because the Offer in Compromise was "returned," not "rejected."  Waight Decl. ¶ 6.  The Court accepts for purposes of this motion the United States' position that 266 days is the correct tolling period, a position which benefits Plaintiffs.

ORDER  -18-

Thus, the statute of limitations had not run as of March 5, 2007, when the United States filed suit to collect on William and Louise's tax liabilities for tax years 1993, 1994, and 1995. The Court DENIES Plaintiffs' Motion for Partial Summary Judgment, docket no. 13.

## CONCLUSION

The Court GRANTS the United States' Motion for Summary Judgment, docket no. 8, and DISMISSES with prejudice Plaintiffs' Complaint to Quiet Title to Real Property based on equitable subrogation, docket no. 1, in Case No. C06-962Z. The Court DENIES as moot Plaintiffs' Motion for Relief from a Deadline to File a Supporting Declaration in Opposition to the United States' Motion for Summary Judgment, docket no. 31. The Court DENIES Plaintiffs' Motion for Partial Summary Judgment, docket no. 13. As a result of this Order, the remaining claims in this consolidated case are contained in the United States' Complaint, docket no. 1, in Case No. C07-340Z.

IT IS SO ORDERED.

DATED this 30th day of August, 2007.

Thomas S. Zilly
United States District Judge